**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **FLORISTS' MUTUAL INSURANCE COMPANY,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **7:05-cv-50 (HL)** |
| | : | |
| **LEWIS TAYLOR FARMS, INC., LTF GREENHOUSES, LLC, and QUALITY PRODUCE, LLC,** | : | |
| **Defendants / Third-Party Plaintiffs,** | : | |
| | : | |
| **DL&B ENTERPRISES, INC.** | : | |
| **Defendant / Cross-Claimant and Third-Party Plaintiff** | : | |
| | : | |
| **and** | : | |
| | : | |
| **LEWIS TAYLOR FARMS, INC., LTF GREENHOUSES, LLC, and QUALITY PRODUCE, LLC** | : | |
| **Defendants/Third-Party Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SYNGENTA SEEDS, INC. and R.D. CLIFTON COMPANY, INC.** | : | |
| **Third-Party Defendants.** | | |

## <u>ORDER</u>

## I. INTRODUCTION

In the fall planting season of 2004, disease struck the crops on Gibbs Patrick

Farms ("GPF"), Lewis Taylor Farms, LTF Greenhouses ("LTF Defendants"

collectively), and DL&B Enterprises ("DL&B").  In this litigation, and in a companion case also filed in this Court,[1] the Parties attempt to assign liability for the economic damage that this incidence of disease caused.  At the core of the dispute is a crop common to each farm: a variety of bell pepper plant called "Stiletto."  Syngenta Seeds, Inc. ("Syngenta") produced the Stiletto seeds at issue, and R.D. Clifton Seed Company, d/b/a/ Clifton Seed Co., Georgia ("Clifton") distributed them.

The farmers assert that their crops suffered from bacterial leaf spot ("BLS"), which is caused by a bacterium called *X. campestris* pv. *vesicatoria* ("XCV").  They further claim that the Stiletto seeds carried XCV and therefore were the cause of the BLS outbreak on their farms.  They seek damages associated with the destruction of their crops and lost profits.

Florists' Mutual, which insures Lewis Taylor Farms and LTF Greenhouses, filed the present lawsuit against Lewis Taylor Farms, LTF Greenhouses, and DL&B Enterprises seeking declaratory judgment regarding their obligations to provide coverage to its insured on the claims that DL&B asserted against LTF Defendants. In response to the declaratory judgment action, DL&B asserted a crossclaim against the LTF Defendants for strict liability and breach of warranty for the seedlings it purchased from LTF Defendants.  The LTF Defendants, in turn, asserted a Third-Party Complaint against Syngenta for indemnification and strict liability and against Clifton for breach of implied warranty of merchantability and strict liability.  DL&B

---

[1]Gibbs Patrick Farms v. Syngenta Seeds, Inc., et al., 7:06-cv-48.

also asserted a strict liability claim against Syngenta.

Before the Court are a total of seven motions. Clifton and Syngenta have filed a Joint Motion in Limine (Doc. 129). In addition, six motions for summary judgment are pending: Florists' Mutual's Motion for Summary Judgment and for Realignment of the Parties (Doc. 139), Syngenta Seeds' Motion as to Defendant DL&B (Doc. 140), Syngenta Seeds' Motion as to Defendants Lewis Taylor Farms, LTF Greenhouses, and Quality Produce (Doc. 144), Clifton's Motion as to Defendants Lewis Taylor Farms, LTF Greenhouses, and Quality Produce (Doc. 146), LTF Greenhouses, Lewis Taylor Farms, and Quality Produce's Partial Motion as to Syngenta and Clifton (Doc. 148), and Lewis Taylor Farms and LTF Greenhouses' Motion against DL&B (Doc. 156). In response to Syngenta's Motion, DL&B has conceded that it is appropriate to grant summary judgment on its sole claim of strict liability against Syngenta. The Court therefore grants summary judgment to Syngenta (Doc. 140), and considers the remaining motions in turn.

## II. FACTS

### A. The LTF Defendants

In 2004, Lewis Taylor Farms, Inc. reorganized itself into three companies: Lewis Taylor Farms, Inc., which continues to own the land and fixed assets; LTF Greenhouses, LLC, which operates the greenhouse division; and Quality Produce,

LLC,[2] which operates the vegetable production, packing, and marketing divisions. In 2004, gross revenues were approximately $2 million for Lewis Taylor Farms. It farmed approximately 1,500 acres and employed about 350 employees. LTF Greenhouses had gross revenues of $1.4 million and employed approximately 40 employees in 2004. It operates on 340,000 square feet of greenhouse space, which enables it to produce 90 million containerized vegetables per year and 10 million containers of pine seedling transplants per year. About 20% of the seedlings that LTF Greenhouses produce are for Quality Produce. Quality Produce had approximately $6.5 million in gross revenues in 2004, and had approximately 310 employees.

LTF Greenhouses is a "greenhouse operation" that grows seeds to seedling stage and sells those seedlings to farmers. LTF SUMF ¶¶ 4-7; According to Brim, one of the owners of LFT, the function of LTF Greenhouses is to "provide a service to growers that grow vegetables for production." Brim Dep. 17:8-11. Generally, LTF takes instructions from the customer on how to grow out the vegetable seedlings.

## B. The Contract Between LTF Greenhouses and DL&B

The seedling contract in this case was established during a conversation between Doug Wilson, President of DL&B, and Neal Kicklighter, an LTF Greenhouse

---

[2]LTF Defendants moved to add Quality Produce, LLC as a party, but have not amended the pleadings; it is therefore not clear what claims they bring or what claims the defend against. Their presence or absence in the case does not, however, affect the Court's analysis.

employee. Doug Wilson briefly testified about this conversation, and stated simply that he purchased transplants from Lewis Taylor Farms. Kicklighter testified that during their conversation Wilson said, "he would like for us to grow some pepper plants for him for the fall." Kicklighter Dep. 115:11-13. DL&B memorialized the substance of that conversation in a fax letter from DL&B employee Phyllis Lewis, which stated:

> I talked with Doug about the 1.4 million pepper plants. He said he wanted you to buy enough Stilletto & Revolution seed for 200,000 plants each. And, we want 1,000,000 Brigadier pepper PLANTS. So, if you would, please tell me how many seed I need to send you for the 1 million Brigadier plants. Doug wasn't sure and asked me to find out from you.

LTF Defendant's Mot. Summ. J. Ex. H. The contract required DL&B to provide the seeds for the Brigadier pepper plants, but LTF Greenhouses was to purchase sufficient seeds to produce the requested number of Stiletto and Revolution plants. DL&B purchased 1,100,000 seeds and had them shipped directly to "Lewis Taylor Nursery;" LTF purchased 234,000 each of the Stiletto and Revolution variety seeds.

The total cost of the contract was $54,232. The June 10, 2004 invoice from LTF itemized the cost. LTF charged $0.028 per transplant for the Brigadere variety, $0.057 for the Stiletto variety, and $0.063 for the Revolution variety. This cost was multiplied times the number of plants requested to yield the following totals: $26,152 for the Brigadere plants, $13,338 for the Stiletto plants, and $14,742 for the

Revolution plants.  An LTF employee testified that the charge for raising a seed to seedling stage was $0.028 per transplant, which is reflected in the charge assessed for the Brigadere seedlings, the variety for which DL&B supplied the seed.  The additional cost in the per-transplant rate for the Stiletto and Revolution plants reflected the cost to LTF of purchasing the seed.  In total, the cost of seeds represented less than 30% of the contract price.  The invoice does not, however, separately itemize the cost of the seed and the cost of raising the seed to transplant stage.

### C.  The Seed Containers' Disclaimer of Warranty & Limitation of Liability

Syngenta packaged the seeds in sealed, labeled cans.  Clifton purchased a complete product from Syngenta and resold it to LTF Greenhouses without breaking the seal on the containers.  The cans contained no disclaimer provision on the outside of the label or any reference to a disclaimer or limit on liability.  The label, however, advised the reader to "open for additional information."  Ponder Dep. 44:10-11.  Inside the fold-out label was a disclaimer of warranties and limitation on liability:

> NOTICE TO BUYER: Syngenta Seeds, Inc. warrants that all seed sold has been labeled as required under applicable state and federal seed law and that the seed conforms to the label description within recognized tolerances.  THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE

DESCRIPTION ON THE LABEL. BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIM OR LOSS RESULTING FROM BREACH OF WARRANTY, BREACH OF CONTRACT, OR NEGLIGENCE (WHICH SHALL NOT EXTEND TO INCIDENTAL OR CONSEQUENTIAL DAMAGES) SHALL BE LIMITED TO REPAYMENT OF THE PURCHASE PRICE.

IMPORTANT NOTICE REGARDING SEED BORNE DISEASES

Syngenta Seeds, Inc. has undertaken all reasonable precautions to identify and control seed borne pathogens on this seed. However, these precautions may include seed treatments cannot assure complete absence of seed borne diseases, especially if the disease is already present in the buyer's field or neighboring fields diseased from other sources. SYNGENTA SEEDS, INC. DISCLAIMS ALL WARRANTIES REGARDING SEED BORNE DISEASES, EITHER EXPRESSED OR IMPLIED, OTHER THAN THE WARRANTIES SET FORTH HEREIN. Please contact Syngenta Seeds if you would like to receive a more detailed description of the risk from seed borne diseases.

Clifton's Statement of Undisputed Material Facts (Doc. 149) ¶ 60.

Clifton presented evidence that Bill Brim was familiar with disclaimers and limitations on liability on other products. There is no evidence in the record, however, indicating that any LTF Defendant had knowledge of these provisions on Stiletto seed cans. Clifton did not provide any additional disclaimer or liability limitation information apart from what was on the cans as a part of its sale to LTF Defendants.

**D. Discovery of BLS**

In mid-June 2004, LTF noticed symptoms of disease in the bell pepper seedlings in Greenhouse 25. Greenhouse 25 contained seedlings from Stiletto green peppers, jalapeno peppers, and several varieties of tomatoes. Lewis Taylor Farms provided samples of pepper and tomato transplants to the University of Georgia ("UGA") Cooperative extension Service Disease Clinic for assessment. The extention program then shipped the samples to Dr. Ron Gitaitis's lab. A routine examination produced colonies of "xanthomonad-like" bacteria from both the tomato and pepper plants, confirming the presence of BLS. Dr. Gitaitis's research indicated, however, that the strain of the bacteria on the peppers was different from the strain found on the tomatoes.

After diagnostic tests confirmed that the plants were infected with BLS, Dr. Gitaitis visited LTF to investigate the source of the inoculum. Dr. Gitaitis inspected a greenhouse containing Stiletto peppers and a field of Hungarian Hot Wax peppers. Upon visually inspecting the peppers, Dr. Gitaitis concluded that the infection on the Hungarian peppers located in the field occurred later in the "life history" of the plants. He came to this conclusion because the symptoms were minor spots as opposed to the extensive blighting that would occur on plants that had BLS from an early stage, and the spots were on the upper canopy instead of at the base of the plant as is typical in cases where BLS has been present earlier.

Dr. Gitaitis found no evidence that the Hungarian peppers were the source of the inoculum for the Stiletto peppers in the greenhouse. On the contrary, he

determined that it was more likely that the Stiletto peppers were the source of the BLS. He based this initial conclusion on: (1) the fact that BLS symptoms were observed while the Stiletto seedlings were young; (2) the visual evidence that BLS was introduced to the Hungarian peppers later in their development in the field; (3) the lack of an "infection gradient"[3] in the greenhouse; and (4) the fact that Greenhouse 25 was the only greenhouse across the street from a field of Hungarian peppers that was infected at the time. Dr. Gitaitis tested samples from his visit to LTF but could not identify the source of inoculum from those tests nor could he distinguish between the strains in the Hungarian and Stiletto peppers.

Dr. Gitaitis's lab then learned of a BLS outbreak in Stilleto peppers on GPF. Isolations from these peppers were tested to confirm that the plants were in fact infected with BLS. Dr. Gitaitis also performed a procedure called repPCR, which confirmed that the strains of BLS in Stiletto peppers from LTF and GPF and Hungarian peppers from LTF were identical, which indicated that the same strain was involved in all three outbreaks. In contrast, peppers from different sources in Georgia that were infected with BLS were found to have different strains of the bacteria. These findings made Dr. Gitaitis suspicious that the strain was seedborne as opposed to being present in the environment.

---

[3] "Infection gradient" refers to the pattern of BLS observed in a population of plants. A random pattern of BLS indicates that there was no point source of inoculum. A concentration of BLS in one area of the greenhouse with a decreasing gradient as the distance from that concentration increased would indicate that the BLS was introduced by a point source.

Dr. Gitaitis then performed a race type analysis on samples of infected Stiletto peppers from different sources. The results indicated that all of the Stiletto peppers were infected with the same race of the BLS strain, another factor which indicated that the source of the bacteria was the seeds themselves.

After this testing, Dr. Gitaitis learned that GPF possessed some unopened cans of the Stiletto seeds it had purchased from Clifton. Using these seeds, Dr. Gitaitis was able to test his theory that the disease was seedborne. The cans were transported to his lab unopened and remained in that condition until the time the tests were performed.

### E.  The Grow-Out Test

Bell peppers have a relatively low level of profitability, which has caused a general dearth of research about disease that affects them. As a result of this lack of research, no industry standard exists for testing whether bell pepper seeds are infected with BLS. In addition, there is no published data that addresses the sensitivity of any method for detecting XCV. Instead, researchers must adapt processes that were developed for use on other plants to detect other kinds of bacteria. Both Defendants' and Plaintiff's experts adapted other methodologies when designing their tests. Dr. Gitaitis chose to perform a "grow-out test," which involves planting the seedlings, allowing them to grow, observing visual signs of the presence of the disease, and then testing any visible legions to determine whether BLS is present. The grow-out test that Dr. Gitaitis designed was modeled after

"sweat box" and "dome" tests, which are used to detect watermelon fruit blotch and halo blight of bean respectively.

Dr. Gitaitis and his assistant, Floyd Hunt Sanders Jr., took precautions during the testing to prevent contamination of the seeds from other sources. The seeds were planted in disposable aluminum trays newly purchased off the shelf from Wal-Mart and were sealed in plastic wrap until the time of use. A new, unopened bag of potting mix was used for planting. All work was done in an area that had never been exposed to peppers, BLS, or the bacteria that causes BLS. Dr. Gitaitis arranged to perform the grow-out in a building called the Head House, which was over 300 yards away from his bacteriology lab, in order to ensure that bacteria from the lab did not enter the environment of the grow-out. The Head House had never been used to conduct bacterial research and had never contained peppers or tomatoes.

Sanders opened the cans of seeds using a can opener that had never been exposed to the bacteriology lab. Approximately 1,000 seeds were planted in each tray. Sanders weighed the seeds in sterilized beakers and poured them into the newly opened trays. He did this without using utensils so that the contact the seeds had with other surfaces was minimized. Potting soil and water were added, and the plastic tops that came with the trays were snapped into place to prevent air movement, reduce the possibility of contamination, and maintain a high degree of humidity inside the trays. The tops allowed the containers to remain sealed for two weeks before they were opened for watering.

Each growth chamber in the Head House had space for four trays of seeds. Although the researchers initially planned to use three chambers for a total of twelve trays, after planting the seeds in trays they discovered that only two growth chambers were available in a location sufficiently far enough away from the bacteriology lab. The tests therefore were limited to the two growth chambers with four trays in each, i.e., approximately 8,000 seeds.

Once the seedlings began to grow, Sanders frequently pulled samples from the trays because there was a lot of spotting on the cotyledons.[4] As part of the effort to prevent contamination by secondary bacteria, samples were pulled as soon as legions appeared. In addition, Sanders wore latex gloves at all times when he handled the trays and samples. Dr. Gitaitis collected 65 suspected legions from cotyledons and 35 suspected legions from first true leaves. Isolations from these legions were made in a standard fashion: lesions were aseptically cut with a sterile blade, the tissue was minced in a sterile buffer, the sample was allowed to rest during which time the bacteria could swim out into the solution, and a sterile bacteriological loop was used to plate a loopful of bacteria onto the surface of a sterile petri dish containing nutrient ager. This entire process was performed under a laminar flow hood, a device that prevents contamination. The plates were then incubated in a covered incubator.

---

[4]A cotyledons is the seed leaf contained within the embryo of the seed that appears above ground during the embryo stage.

None of the cotyledon samples produced XCV; four strains were isolated from the true leaf samples, however.[5] These strains were confirmed as having the same DNA fingerprint and being of the same race as the strains in the Stiletto peppers from LTF and GPF. Based on the above observations, Dr. Gitaitis concluded that the seedlot he tested and the seedlot from LTF were the source of the inoculum of the BLS epidemic observed at the two farms.

### F. Dr. Gitaitis's Qualifications

Dr. Gitaitis holds a Ph.D. in Plant Pathology and serves as a professor of plant pathology for the University of Georgia. He has thirty-two years experience in researching the ecology of bacterial plant pathogens and the diseases that they cause. This background includes extensive experience researching epidemiology of bacterial diseases in vegetables produced in southern Georgia. Dr. Gitaitis developed several techniques that have "advanced and improved the ability to diagnose bacterial diseases of vegetables . . . including techniques that are designed to detect pathogens in seeds. . ." Pl.'s Resp. Mot. Limine Ex. A at 3.

Dr. Gitaitis's experience with diagnosing bacterial pathogens in pepper seeds and plants includes his diagnosis of "all bacterial-like symptoms of tomato and pepper transplants grown as Georgia certified from 1980-1995;" contributions to the Georgia Department of Agriculture's efforts to identify bacteria in pepper seeds in its

---

[5]Dr. Gitaitis speculated that the reason XCV was not detected in the cotyledons was that the presence of other bacteria could have initially masked the XCV.

seed certification program; and evaluation for a commercial seed company of seedlots for BLS. Id.

## F. Transfer of Seedlings to DL&B

When the LTF Defendants' greenhouse manager initially noticed stunted growth and legions on the plants he attempted to contain the problem. The plants were "rogued," which is a process in which the noticeably diseased plants and any healthy looking plants adjacent to them are removed and destroyed. LTF Defendants continued to rogue the plants, but despite these efforts diseased plants continued to appear. The roguing continued until the day the first lot of seedlings were shipped to DL&B. LTF Defendants contend that they called DL&B and told them of the BLS problem prior to shipping, but assured DL&B that it was taking care of the problem and would not ship diseased seedlings.

The seedlings were shipped in July in three separate deliveries stretching over a two-week period. DL&B detected BLS in its fields only a few days after the first and second shipments were planted. BLS was detected on the third shipment upon arrival at DL&B while the seedlings were still on the truck. Race typing analysis revealed that the strain of BLS at DL&B was the same race as the strain found on plants in LTF's greenhouses.[6]

## G. DL&B's Estimation of Lost Profits

Before the BLS outbreak occurred in the fall 2004 season, DL&B grew

---

[6]This was also the same strain found in the plants at GPF.

peppers in 2002 and 2003. In 2002, it averaged a yield of 921.20 bushels per acre on 107.1 acres of pepper on its Butler, Vann, New Clifton, and Overflow Farms. In 2003, it reported yields of 851.24 bushels per acre on 92.9 acres of pepper on the Overflow, Pete's, Lewis, and Vann farms. In the 2004 season that is the subject of this lawsuit, DL&B yielded 798.54 bushels per acre on 89.9 acres of pepper in the Butler and Overflow farms.

DL&B contends that comparing the 2004 yield with the 2002 and 2003 yields does not provide an accurate picture of its losses. Extreme heat and market conditions affected yields in 2002, and Hurricane Isabel had a negative effect in 2003. Therefore, in anticipation of the current litigation, DL&B planted an eight-acre "control field" in 2005 to attempt to measure the expected production of peppers on its farm.

DL&B's control field consisted of eight acres planted in 2005 on a section of DL&B's land called the Darden Farm. The location was randomly selected by DL&B's expert, Allan Thornton. He stated that he went into Darden Farm, looked at the field, "figured that it was pretty uniform," and randomly selected four, ten-plant sections. Thornton Dep. 145:14-17. He used four different plots located in different areas of the field in order to take into account any difference in different parts of the field.

Although DL&B planted approximately 90-100 acres of peppers that year on its Darden, Lewis, Weeks, and Vann farms, it only sampled yields from these

designated eight acres.  In addition, DL&B planted Brigadere variety peppers in its control field instead of Stiletto peppers.  The weather conditions in 2005 were not identical to those in 2004, but they were comparable.  The control field yielded 1,630.88 bushels per acre.

DL&B's remaining pepper crops did not fare so well in 2005, however.  The average yield on the non-control land was 228.20 bushels per acre.  DL&B explains the drastic difference by pointing out that in 2005 it received mislabeled seed that resulted in the production of varieties of peppers other than those it intended to grow, and on an outbreak of Race 4 BLS, which was unrelated to the 2004 Race 6 BLS.  In fact, the purpose of setting aside the control field was to attempt to "measure yield from a segment that appeared to be unaffected [or minimally affected] by the Race 4 BLS and mislabeled seed problem."  Thorton Expert Report ¶ 17.

The 2006 yield of 488.25 bushels per acre on 84 acres of pepper also does not provide an accurate picture of the expected yield due to an outbreak of Race 3 or 4 BLS.  DL&B's expert, however, testified that prior and subsequent to the 2004 outbreak, all incidence of BLS on DL&B's farms had been "isolated to patches" and DL&B's management of the problem had "minimized any reduction of yield."  Id. ¶¶ 8-9.

## III. SUMMARY JUDGMENT

### A. Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court takes the facts in the light most favorable to the nonmoving party. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000). The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. Id. If the evidence that the nonmovant presents, however, is "merely colorable" or "not significantly probative," then summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### B. Strict Liability Claims

LTF Defendants assert claims in strict liability against Syngenta.[7] DL&B also asserts a strict liability claim against the LTF Defendants. All Parties agree that Georgia law applies to these claims. The Motions for Summary Judgment regarding these claims is granted because the Parties in this case cannot bring actions

---

[7]LTF Defendants initially asserted a claim for strict liability against Clifton, but subsequently withdrew that claim. See Doc. 174 at 4.

sounding in strict liability under Georgia law.

Georgia courts have declined to recognize a common law tort for strict liability. Wansor v. George Hantscho Co., Inc., 243 Ga. 91, 91 (1979). In 1968, however, the Georgia legislature enacted a statutory version of strict liability. Id.; Ga. Code Ann. § 105-106 (current version at O.C.G.A. § 51-1-11 (2000)). The statute makes manufactures strictly liable "to any *natural person* who may use, consume or reasonably be affect by" a defective product regardless of the existence of privity. O.C.G.A. § 51-1-11 (emphasis added). The statute does not, however, make a manufacturer liable to a corporation. See id.; U.S. Fidelity & Guar. Co. v. J. I. Case Co., 209 Ga. App. 61, 63 (1993) (holding that Georgia's statute governing strict liability does not allow parties other than natural persons to bring such actions); Mike Bajalia, Inc. v. Amos Const. Co., Inc., 142 Ga. App. 225, 226-27 (1977) ("Strict liability is applicable only in actions by natural persons."). Because DL&B and LTF Defendants are not natural persons, their claims for strict liability fail. The Court therefore grants summary judgment to Sygenta on the LTF Defendants' strict liability claim and to the LTF Defendants on DL&B's strict liability claim.

### B. DL&B's Breach of Warranty Claim Against LTF Defendants

LTF Defendants challenge DL&B's breach of warranty claim because they argue the transaction at issue was a contract for services, and not for the sale of goods. If so, no implied warranty of merchantability would have attached to the seedlings that DL&B received from LTF Greenhouses. Alternatively, they argue that

the damages DL&B seek are speculative and therefore cannot be recovered as a matter of law.  For the reasons set out below, the Court agrees on both counts.

### 1.  Contract for Services

#### (i) Standard

The warranty provisions of the Uniform Commercial Code ("UCC") apply only to transactions involving the sale of goods.  O.C.G.A. § 11-2-102 (2002); Gee v. Chattahoochee Tractor Sales, Inc., 323 S.E.2d 176 (Ga. App. 1984).  Where a contract involves both goods and services, the UCC applies when the predominant element of the contract is the sale of goods.  Heart of Texas Dodge, Inc. v. Star Coach, LLC, 567 S.E.2d 61, 63 (Ga. App. 2002).  A court "must look to the primary or overall purpose of the transaction" to determine what the predominant element of the contract is.  Mail Concepts, Inc. v. Foote & Davies, Inc., 409 S.E.2d 567, 569 (Ga. App. 1991).  If the predominant element of the contract is the sale of goods, then the contract is viewed as a sales contract even though the actual provision of goods required a substantial amount of service.  J. Lee Gregory, Inc. v. Scandinavian House, L.P., 433 S.E.2d 687, 689-90 (Ga. App. 1993).

In reaching its conclusion, the court should consider "contractual language, the circumstances surrounding the contract, and the nature of the goods at issue." BMC Industs., Inc. v. Barth Industs., Inc., 160 F.3d 1322, 1331 (11th Cir. 1998). "When there is no genuine issue of material fact concerning the contract's provisions . . . a court may determine the issue as a matter of law." BMC Industs., 160 F.3d at

1331; see also So. Tank Equip. Co. v. Zartic, Inc., 471 S.E.2d 587, 589 (Ga. App. 1996) (holding that the question of whether a contract is for the sale of goods or services may be taken away from the jury "when the facts necessary for that determination are undisputed"). There is no written contract in the present case,[8] therefore the Court must rely on the Parties' description of the contract and the context in which the contract was made.

When the price assignable to services is less than the price assignable to the cost of goods, and when there is no separate price in the contract for services rendered, these factors indicate that the contract is for the sale of goods. So. Tank Equip., 471 S.E.2d at 588. But if the buyer furnished raw materials and instructions, the contract is more likely for the provision of services. OMAC, Inc. v. Southwestern Mach. & Tool Works, Inc., 374 S.E.2d 829, 829 (Ga. App. 1988); Al & Zack Brown, Inc. v. Bullock, 518 S.E.2d 458, 462 (Ga. App. 1999). A typical example of a hybrid contract for goods is a contract for a good that requires installation; in such a case

---

[8]DL&B urges the Court to consider the "contract" printed on the back of the shipping invoice, which arrived when the plants were delivered and was titled "NOTICE TO BUYER: THIS CONTRACT FOR SALE BY LEWIS TAYLOR FARMS TO BUYER IS FOR VEGETABLE PLANTS." The "contract" was not signed, nor were the blank spaces filled in. DL&B does not argue that this language actually created a contract between the Parties; indeed, because the form includes a disclaimer of warranty, a finding that the writing was part of the contract would likely preclude DL&B from recovery under a warranty theory. The blank form on the back of the invoice was not part of the contract between the Parties. See, e.g., Sherman Foundry v. Mechanics, Inc., 517 S.W.2d 319, 322 (Tex. Civ. App. 1974) (holding that invoices did not alter the terms of the oral contract). And DL&B has pointed to no evidence that it became a part of the contract through a usage of trade or prior dealing. See, e.g., Puget Sound Financial, LLC v. Unisearch, Inc., 47 P.3d 940 (Wash. 2002) (finding the terms of an invoice may be part of a contract based on trade usage or course of dealing). As such, the blank form does not have a strong bearing on the analysis.

the service of installation is incidental to the provision of the good itself. <u>See, e.g.</u>, <u>D.N. Garner Co., Inc. v. Ga. Palm Beach Aluminum Window Corp.</u>, 504 S.E.2d 70, 73-74 (Ga. App. 1998). In contrast, a contract for repair of an item that requires the purchase of parts to complete the repair is a contract for services, and the provision of the replacement parts is incidental. <u>Heart of Texas Dodge</u>, 567 S.E.2d at 63.

The Georgia Court of Appeals addressed a similar case in <u>Gilbert v. Copeland</u>. 97 S.E. 251 (1918). In that case, the court was faced with a written contract that required a grower to raise seed and deliver the resulting crops for the customer. <u>Id.</u> at 253. The contract specified that the seeds would remain the customer's property, and gave the customer the right to enter the field at any time and provide direction to the grower on how to cultivate the seeds. <u>Id.</u> According to the contract, consideration was provided " 'for his services in the growing and delivering' of the seed." <u>Id.</u> at 254. The court concluded that the contract was for services. <u>Id.</u>

DL&B insists that a more recent case is controlling, in which the court found a contract for goods. In <u>Embryo Progeny Associates v. Lovana Farms, Inc.</u> the court found a contract for goods where the plaintiff entered into a lease agreement for a herd of breeding cattle. 416 S.E.2d 833, 834 (Ga. App. 1992). Under the agreement, breeding cattle embryos were transplanted into recipient cattle, and under a separate maintenance agreement a fee was paid for each successful transplant and for the weaning of the offspring. <u>Id.</u> The court held that viewing the

agreements as a whole, the contract was for the sale of goods.  Id.  It likened the breeding process to the manufacturing process; although a substantial amount of services were involved, the essence of the contract was the production of cows. Id.

(ii)  Analysis

The facts of this case straddle the line between a sales and a service contract with the grace of a law school hypothetical.  If DL&B had purchased all of the seed that was to be grown to seedling stage and provided it to LTF, it would be evident that the contract was one for services, as in Gilbert.  In such a case, the overriding purpose of the contract would be to provide a "shortcut" to DL&B; instead of DL&B having to expend the time, resources, and space required to grow its seeds to seedling stage, LTF Greenhouses would provide this service for it.  Alternatively, if LTF took orders for bell pepper seedlings and ordered all its own seeds independently, it would be plain that the contracts it entered into would be for the sale of goods and seeds would simply be materials that it had to buy to produce those goods.  Instead, however, both DL&B and LTF purchased the seed that was the subject of the contract.

In addition, although the invoice did not segregate the cost of the seeds from the cost of the services, the agreement and the invoice taken together demonstrate that these costs are easily divisible.  The undisputed testimony was that the charge to customers of raising seedlings was $0.028 per transplant.  This price is consistent with the price charged for the Brigadere variety, which was the seed that DL&B

22

provided.  Furthermore, the per transplant price of the Stiletto and Revolution varieties was equal to $0.028 plus the cost of seed.

Although these facts present a close case, in weighing the facts the scales tip in favor of finding a contract for services.  The vast majority of the seedlings were produced from seeds that DL&B provided.  The $0.028 per transplant charge for raising the seedling represents 70% of the contract price–significantly more than the portion of the total price that went to the charge for buying the seeds. The context of the transaction also indicates that the purpose of the contract was to provide services in raising seedlings: evidence was presented that LTF Greenhouses' purpose is to provide greenhouse services to farmers and carry out that service according to the farmers' instructions.  Finally, evidence of the oral agreement between the DL&B and LTF is consistent with this holding.  Kicklighter, the LTF employee, related that during the conversation in which the sale was arranged, Wilson said, "he would like for us to grow some pepper plants for him."  Kicklighter Dep. 115:11-13.  Wilson's testimony was not inconsistent with this statement.

This holding is in accord with Georgia precedent.  In this case the Court does not have the luxury of the written contract specifying a contract for services as the Gilbert court had.  Nonetheless, as in Gilbert, LTF Greenhouses was obligated to take the seeds–most of which the customer provided–cultivate them, and deliver them to the customer.  Also like the customer in Gilbert, DL&B maintained title to the vast majority of seeds that LTF Greenhouse was growing to the seedling stage.  In

contrast, the plaintiff in <u>Embryo</u> never had title over the embryos that were implanted into the breeding cattle. The value of the thing purchased in <u>Embryo</u> was in the final product. In contrast, the value of the thing purchased in <u>Gilbert</u> and in the present case was the service performed. Both DL&B and the grower and <u>Gilbert</u> could have grown their own seeds, but instead they chose to hire someone to do it for them.

The Court therefore finds that the contract at issue was for services, and therefore the implied warranty of merchantability that applies to sales under the UCC does not apply to the present case. Because no warranty attached to the transaction between DL&B and LTF, DL&B's breach of warranty claim must fail.

### 2. Uncertainty of Damages

Even if the Court found that the contract in question was for the sale of goods DL&B's breach of warranty claim would fail because its evidence of damages is too uncertain. Georgia law provides that a party may not recover expected profits unless there is evidence that proves the loss with reasonable certainty. <u>DeVane v. Smith</u>, 268 S.E.2d 711 (Ga. App. 1980); <u>Farmers Mut. Exchange of Baxley, Inc. v. Dixon</u>, 247 S.E.2d 124 (Ga. App. 1978); <u>Kitchens v. Lowe</u>, 228 S.E.2d 923 (Ga. App. 1976). Evidence of "crops grown in the same soil, planted under identical weather conditions, planted at the same time, and fertilized and cultivated in the same manner" meets this standard. <u>Morey v. Brown Milling Co.</u>, 469 S.E.2d 387, 391 (Ga. App. 1996). Alternatively, evidence of like crops that were grown on the year in question or on the same land during preceding years will suffice. <u>Ayers v. John B.</u>

Daniel Co., 133 S.E. 878, 879 (Ga. App. 1926). Georgia courts have also upheld evidence of lost profits where the plaintiff could not show a past track record of peach crop production, but was able to show peach crop production on a different part of the same farm. Crosby v. Spencer, 428 S.E.2d 607, 609-10 (Ga. App. 1993).

Crosby provides a more forgiving articulation than most Georgia cases of the standard for certainty in lost profits. The plaintiff in that case sought damages for peach trees injured on a 44-acre tract of land. Id. at 609. For purposes of comparison, he presented evidence of the peach crop from trees located on the "homeland," which was a separate piece of land located on the same property and farmed as a single unit with the 44-acre tract. Id. The Court held that this evidence was sufficient to support a jury's award of damages because there was evidence of the similarities between the trees and soil conditions on the two sections of land. Id. 609-10.

Like the Crosby homeland, the control field was planted in a location separate from the affected land. In this case, however, a different variety of plant was grown on the control field a year later, in contrast to the trees in Crosby that were similar to and were planted at the same time as the damaged trees. And although DL&B used the same farming techniques in both 2004 and 2005, there was no evidence of the condition of the soil in either year as there was in Crosby. In addition, DL&B reported that the 2005 weather conditions were "comparable" to the 2004 conditions, but not identical as required in Morey. The differences between the 2004 crop and

the 2005 control field are so substantial that a jury could not make a reasonable estimate of lost profits due to the BLS outbreak.  Because DL&B failed to carry its burden to present evidence that proves the loss with reasonable certainty, it cannot recover.

### C.  Lewis Taylor Farms's Breach of Warranty Claim Against Clifton

Lewis Taylor Farms asserts a claim for breach of implied warranty of merchantability against Clifton for the seeds it purchased.  Clifton has moved for summary judgment on this claim, asserting that the disclaimer on the seed containers effectively disclaimed any implied warranty and that the limitation of remedies clause prohibits Lewis Taylor Farms from recovering more than the cost of the seeds.  The Parties dispute whether the provisions were part of the contract between them.

The Court finds first that the written disclaimer and limitation of liability did not protect Clifton, and second that no disclaimer or liability limitation became a part of the contract through a prior course of dealing or usage of trade.  These provisions therefore provide no protection to Clifton.  Clifton's Motion for Summary Judgment is thus denied and LTF Defendants' Motion for Partial Summary Judgment as to Clifton's Second Additional Defense is granted.

### 1.  Applicability of the Written Warranty to Clifton

During the conversation between Bill Brim and Eric Clifton, Brim offered to buy seeds and Clifton promised to promptly ship them.  There was no discussion of the

disclaimer and limitations provisions. The contract for the sale of the seeds therefore did not include those provisions. Clifton argues that in its prior course of dealing with Lewis Taylor Farms it has always "passed on" the disclaimer on the Syngenta seed cans, and that the disclaimer and limitation of liability on the cans were part of the Parties' contract through their prior course of dealing.[9] The Court holds, however, that regardless of the prior course of dealing, the disclaimer language applies only to Syngenta. The written provisions on the seed cans therefore do not affect Clifton's liability for breach of an implied warranty.

Under Georgia law, the implied warranty of merchantability may be excluded if the disclaimer mentions merchantability and, in the case of a writing, is conspicuous. O.C.G.A. § 11-2-316(2). However, "a manufacturer's disclaimer of warranties does not run with the goods so as to protect any subsequent seller of them; thus, each subsequent seller must make his own independent disclaimer in order to be protected from warranty liability." 63 Am. Jur. Prods. L. § 801; see also Clark v. DeLaval Separator Corp., 639 F.2d 1320, 1324 (5th Cir. 1981) (finding that seller's disclaimer was ineffective as to manufacturer); Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc., 797 P.2d 835, 839 (Colo. App. 1990) ("each subsequent seller must make his own independent disclaimer in order to be

_____

[9]Clifton also contends that the disclaimer and limitations of liability are valid because they were conspicuous as required under O.C.G.A. § 11-1-201. Whether they were conspicuous, however, is irrelevant if they were never a part of the contract in the first place. See, e.g., Bowdoin v.Showell Growers, Inc., 817 F.2d 1543, 1546-47 (11th Cir. 1987) ("the conspicuousness of a post-sale disclaimer is immaterial").

protected from warranty liability"); <u>Barazotto v. Intelligent Systs., Inc.</u>, 532 N.E.2d 148, 149 (Ohio App. 1987) (""[T]he manufacturer's disclaimer of warranties does not run with the goods so as to protect any subsequent seller of them. To the contrary, each subsequent seller must make his own independent disclaimer in order to be protected from warranty liability."); The Law of Product Warranties § 8:14 (November 2007) ("In the usual case, a distributor or dealer must make his own disclaimer in order to be free from implied warranty liability. He cannot rely on a disclaimer used by the manufacturer even though he passes that documentation on to the ultimate buyer.").

A seller may be shielded by a manufacturer's disclaimer when it provides a written disclaimer to the buyer independent of the materials that the manufacturer provides. <u>See, e.g.</u>, <u>Graham Hydraulic Power, Inc.</u>, 797 P.2d at 839. Where the language of the disclaimer explicitly applies to the manufacturer, however, it will not effectively disclaim implied warranties that apply to the seller. <u>See, e.g.</u>, <u>Stephens v. Crittenden Tractor, Co.</u>, 370 S.E.2d 757, 761 (Ga. App. 1988) (holding that a limitations clause that applied to the manufacturer was not effective as to the dealer). In <u>Stephens</u>, for example, the Georgia Court of Appeals held that the following language limited liability for the manufacturer, but not the dealer who sold the product: "The Company's liability, whether in contract or in tort, arising out of warranties, representations, instructions, or defects from any cause shall be limited exclusively to repairing or replacing parts . . . in no event will the Company be liable

28

for consequential damages . . . " <u>Stephens</u>, 370 S.E.2d at 761. The <u>Stephens</u> court looked to the language of the manufacturer's limitation of liability to determine whether it applied to the dealer. <u>Id.</u>; <u>see also</u> <u>Chem Tech Finishers, Inc. v. Paul Mueller Co.</u>, 375 S.E.2d 881, 883 (Ga. App. 1988) (using the plain language of the contract to determine to what products the warranty limitation applied). The contract contained explicit reference to both the manufacturer and the dealer, yet by its terms the limitation clause in the contract applied only to the manufacturer. <u>Stephens</u>, 370 S.E.2d at 761. The court therefore concluded that the limitation did not protect the dealer. <u>Id.</u>

The disclaimer on the Stiletto seed container that addresses seed borne illnesses specifically states: "SYNGENTA SEEDS, INC. DISCLAIMS ALL WARRANTIES REGARDING SEED BORNE DISEASES, EITHER EXPRESSED OR IMPLIED, OTHER THAN THE WARRANTIES SET FORTH HEREIN." The general disclaimer also refers specifically to Syngenta:

> Syngenta Seeds, Inc. warrants that all seed sold has been labeled as required under applicable state and federal seed law and that the seed conforms to the label description within recognized tolerances. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE DESCRIPTION OF THIS LABEL. BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIM OR LOSS RESULTING FROM BREACH OF WARRANTY . . . SHALL BE LIMITED TO REPAYMENT OF THE PURCHASE PRICE.

The disclaimer against seed borne illness, which is the subject of the dispute in this case, is explicitly made on Syngenta's behalf and makes no mention of dealers or secondary sellers.  Even the general disclaimer and limitation of liability deal only with Syngenta.  After Syngenta expressly warrants the information on the seed label, it expressly disclaims its liability for other warranties.  Like the contract language in Stephens, the seed label in this case refers to the producer specifically instead of to a generic "seller."  As a result, the disclaimer and limitations apply only to Syngenta, instead of applying to any seller of the product.  In addition, like the dealer in Stephens, Clifton made no independent disclaimer of warranty, which it could have done by including a disclaimer in a sales contract, for example.  Even if LTF Defendants had read and been aware of the terms on the seed labels, they would still not have known that Clifton, as opposed to Syngenta, had disclaimed all warranties.  Applying the plain-language approach that the Georgia Court of Appeals took in Stephens, the Court finds that neither the disclaimer nor the liability limitation apply to Clifton by their terms.  Therefore, under Georgia law, the terms of the disclaimer and the limitation of liability do not apply to Clifton and were not incorporated as a term of the contract between Clifton and Lewis Taylor Farms.

### 2.  Disclaimer or Limitation of Liability by Usage of Trade

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be

observed with respect to the transaction in question." O.C.G.A. § 11-1-205(2). The usage of trade concept allows the commercial context in which the parties operate to supplement the terms of the contract. U.C.C. cmt. 1. The existence of the custom or usage of trade and its scope are issues of fact, <u>Ga. Timberlands, Inc. v. So. Airways Co.</u>, 188 S.E.2d 108 (Ga. App. 1972), and the party asserting the usage of trade bears the burden of proving it. <u>All Angles Const. & Demolition, Inc. v. Metropolitan Atlanta Rapid Transit Auth.</u>, 539 S.E.2d 108 (Ga. App. 1972). "To make a usage and custom of trade binding, it must be known, certain, uniform, reasonable, and not contrary to law." <u>Citizens & So. Bank v. Union Warehouse & Compress Co.</u>, 122 S.E. 327 (Ga. 1924).

If seed merchants disclaimed warranties and limited liability with such regularity that it became a usage of trade, a disclaimer or limit on liability would have become a part of the contract.[10] In support of its usage of trade argument, Clifton presents evidence of the label of a seed container of Seminis seeds, which disclaims liability both for the seller and the manufacturer of the seed; an example of the disclaimer used on seed containers by seed producer Harris Moran, which disclaims liability only for itself; a disclaimer placed on the back of an order form of seed producer Abbott & Cobb; and an affidavit of the president of seed distributor Siegers

---

[10]Clifton frames the issue as whether the printed disclaimer and remedy limitation on the seed containers were incorporated into its contract with Lewis Taylor Farms by a usage of trade. The Court has held, however, that the terms of the disclaimer do not apply to Clifton, and therefore even if this term was part of the contract it would not affect Clifton's liability.

Seed Company, which states that Siegers "passed on to Gibbs Patrick Farms, Inc. the disclaimer of warranty and limitation of liability on the seed container of those seeds." Doc. 149-20 ¶ 6.

Clifton has failed to present evidence, however, that seed distributors regularly passed on seed manufacturers' disclaimers or that those disclaimers were typically effective against both the manufacturer and distributor. The only evidence from a seed distributor other than Clifton was from the president of Siegers Seed company. His testimony, however, says nothing about passing on disclaimers or limitations of liability to any other seed purchaser except Gibbs Patrick Farms; a usage of trade cannot be established by one company's course of dealing with one other company.

In addition, even if there was enough to show usage of trade for passing on disclaimers, the evidence does not support a finding that those disclaimers were universally effective to protect seed distributors. The Harris Moran disclaimer explicitly applies only to the manufacturer, not the seller, and it thus does not establish a usage of trade with regard to disclaimers by distributors of seed. The Abbott & Cobb disclaimer appeared only on the back of a order form, therefore a farmer purchasing seed through a distributor (instead of directly from producer Abbott & Cobb) would have never even seen this disclaimer. The Seminis seed container, which contains provisions disclaiming liability for both the manufacturer and seller, is the only evidence of any label that would be effective to disclaim or limit liability for seed distributors. Nonetheless, Clifton has failed to create a material

issue of fact regarding a usage of trade because a reasonable factfinder could not conclude that Clifton carried its burden to establish that a universal usage of trade existed from this solitary piece of evidence, especially when that evidence is contradicted by other disclaimers that would not protect seed distributors. The Court therefore holds that neither a disclaimer nor a limitation of liability became a part of the contract between Clifton and Lewis Taylor Farms through a usage of trade.

### D.  LTF Defendants' Claims Against Syngenta

A claim for indemnity does not exist when the underlying cause of action has been dismissed.  Fowler v. Vineyard, 405 S.E.2d 678, 683-84 (Ga. 1991).  Because the Court has dismissed DL&B's claims against LTF Defendants, LTF Defendants no longer have a claim for equitable indemnity against Syngenta.  That claims is therefore dismissed, and Syngenta's Motion for Summary Judgment is dismissed as moot.

### E.  Florists' Mutual's Obligation to Provide Coverage to Its Insured

Florists' Mutual filed the present action seeking a declaratory judgment regarding its liability to DL&B for claims that DL&B asserted against the insured, i.e., LTF Greenhouses and Lewis Taylor Farms.  Florists' Mutual has moved for summary judgment on the declaratory judgment action.  With this Order, however, the Court disposes of DL&B's claims against the insured.  As a result, no claims remain on which the Court could declare Florists' Mutual's liability, and the action for declaratory judgment is therefore dismissed.  Florists' Mutual's Motion for Summary

Judgment is likewise dismissed as moot.

## IV. MOTION IN LIMINE

Clifton challenges the introduction of the expert testimony of Dr. Gitaitis. Dr. Gitaitis's testimony includes his involvement in the initial diagnosis of the problem on the farms, the results of his testing, and his expert opinion that the source of the disease was the Stiletto seeds. The Court finds that Dr. Gitaitis's testimony is admissible and therefore denies Clifton's Motion in Limine.

### A. Requirements under Rule 702

The testimony of an expert "may be assigned talismanic significance in the eyes of lay jurors." United States v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004). It has a potentially powerful and misleading effect because of the difficulty in assessing it. Id. at 1260. The Federal Rules of Evidence therefore require trial courts to act as gatekeepers and analyze the foundations of expert opinions to ensure they meet the admissibility standard of Rule 702. Id. The purpose of this gatekeeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Under Rule 702, the trial court must engage in a rigorous, three-part inquiry that examines whether the expert is qualified, whether the methodology is sufficiently

reliable, and whether the testimony will assist the trier of fact.  City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998).  The proponent of the expert testimony, in this case the Plaintiff, bears the burden of demonstrating by a preponderance of the evidence that his expert meets these requirements.  See Frazier, 387 F.3d at 1260 (placing the burden on the party offering the expert testimony); Daubert, 509 U.S. at 592 n.10 (noting that Federal Rule of Evidence 104(a) requires the trial judge to make a determination of admissibility by a preponderance of the evidence).  In the present case, the Court agrees with the Parties that the testimony at issue would be given by an expert who is sufficiently qualified and that it would assist the trier of fact.  As noted above, Dr. Gitaitis's qualifications are extensive.  In addition, his testimony goes to the core issue in the case, i.e., the cause of BLS in the Stiletto peppers at GPF and LTF.  Defendant challenges, however, the admission of Dr. Gitaitis's expert opinion on the ground that it is unreliable.  The Court therefore focuses its inquiry on this prong of the test.

**B.  Reliability**

In Daubert, the Supreme Court of the United States considered the standard for expert testimony under Rule 702.  After the adoption of the Federal Rules of Evidence, many courts had continued to utilize the "Frye" test when assessing the admissibility of expert testimony.  Daubert, 526 U.S. at 587.  Under that test, expert testimony was only admissible when it was based on a technique that was "generally accepted" as reliable in the scientific community.  Id. at 584.  The Court held that this

high bar for admissibility was inconsistent with the liberal approach to discovery in the Federal Rules.  Id. at 589.

In attempt to lower that bar, the Court articulated a standard derived from the language of Rule 702 itself.  Rule 702 in its current form states:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The Court reasoned that in order for an expert's testimony to be based on "scientific knowledge," the opinion must be "derived by the scientific method."  Daubert, 509 U.S. at 590.[11]  "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."  Id.  At the core of Daubert is the requirement that courts focus "solely on principles and methodology, not on the conclusions that they generate."  Id. at 595.

The Daubert Court provided a non-exhaustive list of factors to guide the inquiry into the reliability of expert testimony: (1) whether the methodology can and has been tested, (2) whether the theory or technique has been subjected to peer

---

[11]The scientific method is a process for proposing hypotheses and testing them to see if they can be disproved.  Daubert, 509 U.S. at 593; U.S. v. Bynum, 3 F.3d 769, 774 (4th Cir. 1993) (defining the scientific method as "subjecting testable hypotheses to the crucible of experiment in an effort to disprove them").

review and publication, (3) the known potential rate of error and the existence of standards controlling the technique's operation, and (4) whether the theory or methodology has been "generally accepted" by the scientific community. Id. at 592-94. In addition, the Advisory Committee Notes to the Federal Rules provide additional factors that may be useful in assessing reliability:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1997).
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . .
> (3) Whether the expert has adequately accounted for obvious alternative explanations. . . .
> (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." Sheenan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997). . . .
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. . . .

Fed. R. Evid. 702 advisory committee's note (2000).

Each step of the expert's analysis must be demonstrated to be reliable; if any step fails the Daubert test, the entire testimony is inadmissible. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1245 (11th Cir. 2005). It is important to note, however, that the reliability test under Daubert is flexible. Daubert, 509 U.S. at 594. The factors may not be relevant in all cases, or it may be appropriate to apply different factors in addition to those listed in Daubert. Kuhmho Tire Co., 526 U.S.

at 141. For example, reliability concerns may be more properly addressed by focusing on the personal knowledge or experience of the expert rather than his methodology. Id. at 150. The trial court has significant discretion to conduct the reliability analysis for expert testimony. Id. at 152.

Plaintiff proposes to offer testimony by Dr. Gitaitis regarding his initial investigation and the grow-out test he performed between October and November 2004. Evaluation of expert testimony on the topic of the cause of BLS in bell pepper plants is difficult, however, because of the lack of research attention and resources devoted to the detection of disease in these plants.[12] There is, for example, no standard protocol for the detection of BLS in bell peppers. Therefore, although the use of grow-out testing to detect BLS in bell pepper plants has not been subject to publication or peer review, neither has any other method.[13] In addition, there is no published data that addresses the sensitivity or specificity of any method for

---

[12]This and other evidence comes from an affidavit by Dr. Jeffery B. Jones. The Court previously granted a Motion to Strike Dr. Jones's testimony due to its untimeliness under Rule 26. This rule, however, only addresses requirements for expert testimony for use *at trial.* Expert testimony that does not comply with this rule is therefore only excluded at trial and may be properly considered in a Daubert determination. See Fed. R. Civ. P. Rule 26.

[13]It appears from the evidence before the Court that the National Seed Health System (NSHS) have a "temporary standard" for the detection of BLS in bell peppers. According to one witness, the standard is adopted from that used to isolate black rot on crucifers. When NSHS adopts a temporary standard, the protocol is tested and eventually recommended if the standard proves reliable. Although it is not clear from the record, the NSHS's current standard may have been subject to some peer review. See, e.g., Pl.'s Resp. Ex. M 66:23-67:4. Even if it has, there is no evidence of what the results of those studies were. Regardless, however, it has not crossed the threshold from temporary to an adopted standard and it is therefore not a standard protocol that has been deemed reliable.

detecting XCV in bell pepper seeds.[14] It is certainly possible to test the effectiveness of grow-out and seed wash tests for the detection of XCV in bell pepper seeds, but there is no existing research that does so. This is therefore not a case in which the expert is using a rogue methodology instead of a widely accepted, time-tested standard procedure. Although the Court will consider the lack of published data, known rate of error, or standard protocol for the grow-out test, these factors weigh less heavily in the present case due to the simple fact that this kind of information is not available for the detection of BLS in bell pepper seeds. The Court therefore must look primarily to other aspects of Dr. Gitaitis's methodology to determine whether it is sufficiently reliable.

### 1.  The Existence of Standards Controlling the Technique's Operation

In <u>Daubert</u>, the Court held that one factor that bears on the question of reliability is "the existence and maintenance of standards controlling the technique's operation." <u>Daubert</u>, 509 U.S. at 483. In the present case, although the sweat box and dome tests on which Dr. Gitaitis's grow-out were modeled were relatively simple procedures, standards did nonetheless exist to govern them, and Dr. Gitatis described them in his testimony and reports. Those standards included planting the seeds, covering the containers, growing them under lights, and making isolations of any legions once they were discovered. They also included contamination

---

[14]As the Daubert Court recognized, "[s]ome propositions . . . are . . . of too limited interest to be published." <u>Daubert</u>, 509 U.S. at 593. Therefore, although publication is relevant to the inquiry, it is not dispositive. <u>Id.</u> at 594.

prevention steps during the grow-out and culturing stages. Dr. Gitaitis performed this "standard seed assay test" in a "professional manner in accordance with pathological scientific standards." Jones Aff. ¶ 8.

### 2. "Generally Accepted" Methodology and Extrapolation

General acceptance of a methodology among the scientific community weighs in favor of admission of expert testimony, although it is not a prerequisite. Daubert, 509 U.S. at 594. The grow-out test is a generally accepted methodology for use in the detection of watermelon fruit blotch and halo bean blight. Dr. Gitaitis took these methodologies, which are known to be effective in these other contexts, and extrapolated to conclude that they would be effective in the detection of XCV in bell peppers.

As the Supreme Court has noted, experts often use existing data to extrapolate and form conclusions. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). This practice is acceptable, as long as the gap between the data and the opinion is not "too great" and something beyond the mere *ipse dixit* of the expert connects them. Id. In this case, extrapolating from the halo bean blight and watermelon fruit blotch methodologies to form a procedure for detecting XCV in bell peppers was not an unwarranted analytical leap. Experts from both sides agree that it is common practice to use a test from one seed as a starting point to develop tests for other seeds. Dr. Gitaitis provided an explanation of the test and how it would work effectively in bell peppers. The Court therefore finds that the grow-out was a

reasonable adaptation of a generally accepted standard seed assay.

        3.   "Hired Gun" Research and Conscientiousness of Litigation Consulting Compared to Regular Research

Two factors that the Advisory Committee Notes include in the <u>Daubert</u> analysis are whether the expert plans to testify regarding research conducted for the purpose of litigation only and whether the expert is being as careful in his paid litigation consulting work as he would be in his regular practice. Fed. R. Evid. 702 advisory committee's note. In this case, the Court finds it "very significant" that the expert is testifying regarding research conducted independent of the litigation. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> (<u>Daubert II</u>), 42 F.3d 1311, 1317 (9th Cir. 1995). Dr. Gitaitis performed the research in this case in his function as a university researcher, not as a paid litigation consultant. The Court therefore easily concludes that Dr. Gitaitis exercised the same degree of care in this research as he does in his other research. Furthermore, even a witness for Clifton acknowledged Dr. Gitaitis's skill as a scientist and expressed his "deep respect for the research and contributions he has made to the vegetable industry." Pl.'s Resp. Ex. P ¶ 4. This factor therefore weighs heavily in favor of finding his testimony reliable.

The challenging parties have launched an attack on Dr. Gitaitis's experiment as "designed specifically for this litigation." This argument is without merit, however, since the only testimony regarding the purpose of the grow-out was that Dr. Gitaitis performed it as part of his work as a researcher for UGA through UGA's extension

program, which offers "expertise [to growers] to solve problems that they are encountering. Dep. Gitaitis 13:8-14:1. The service is performed in the public interest, not to advance private litigation. Furthermore, the investigation in this case occurred well before the litigation ensued.

### 4. Accounting for Obvious Alternative Explanations

Clifton targets Dr. Gitaitis's "inherently biased" investigation, alleging that his sole goal was to prove the Stiletto seed was the source of the infection. It contends that Dr. Gitaitis's failure to take into account other possible explanations for the occurrence of BLS demonstrates this bias. A closer look at this argument and the facts of the case, however, demonstrate the fallacy of this logic.

When an expert eliminates an alternative hypothesis, that elimination "must be founded on more than 'subjective beliefs or unsupported speculation.' " Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1058 (9th Cir. 2003) (quoting Claar v. Burlington N. R.R. Co., 29 F.3d 499, 502 (9th Cir. 1994)). Although the expert must account for obvious alternative explanations, J & V Dev., Inc. v. Athens-Clark County, 387 F. Supp. 2d 1214, 1226 (M.D. Ga. 2005), he does not have to eliminate every other possible cause. Jahn v. Equine Svcs., PSC, 233 F.3d 382,390 (6th Cir. 2000); see also Ambrosini v. Labarraque, 101 F.3d 129, 140 (D.C. Cir. 1996) (reasoning that the fact that some causes have not been eliminated goes to weight, not admissibility).

Dr. Gitaitis visited LTF to investigate the source of BLS. His observations led

to conclusions that were based on his years of experience and the instinct he has developed over those years. As the Eleventh Circuit has acknowledged, "experience in a field may offer another path to expert status" when it is clear " 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " Frazier, 387 F.3d at 1260-61 (quoting Fed. R. Evid. 702 advisory committee's note). Dr. Gitaitis testified that he focused on the Stiletto seed as the source of the BLS due to the pattern of the infection, the distance between the field and the greenhouse, and the stage and severity of the BLS in the Hungarian peppers and the Stiletto peppers. He explained the idea of an infection gradient and the effect of BLS on peppers when it is contracted at different life stages. Finally, he applied his knowledge regarding these things to the facts as he observed them, and he explained why these factors led him to exclude the Hungarian peppers or an endemic strain of bacteria as the source of the infection. He therefore accounted for obvious alternative explanations using his experience and knowledge instead of through experimentation, and this method is sufficiently reliable under Rule 702.

### 5. Field of Expertise

If the field of expertise the expert claims is known to reach reliable results for the kind of opinion offered, then that factor weighs in favor of finding the testimony reliable. In this case, the field of expertise is plant pathology; the kind of opinion offered is an opinion regarding the source of bacteria in plants. Although no specific

evidence was offered on this point, the Court notes that UGA maintains a plant pathology program and that farmers regularly rely on plant pathology experts to diagnose plant pathogens. This factor therefore weights in favor of finding the testimony reliable.

### 6. Other Objections

The Court finds that the remaining arguments that Clifton asserts lack merit. It attacks Dr. Gitaitis's expert testimony because the initial investigation was inconclusive and allegedly "did not adhere to principles of good science," his grow-out test results could not be replicated, he did not follow a written protocol in the execution of the test, there was a risk of contamination of the seeds, and he disregarded evidence of Defendant's pre- and post-marketing testing. The Court addresses each of these concerns in turn.

### (i) Initial Investigation

The attacks on Dr. Gitaitis's initial investigation mischaracterize his preliminary observations and findings. As previously explained, Dr. Gitaitis developed what he characterized as a suspicion that the Stiletto seeds were the source of the inoculum. This suspicion was based on his experience and observations of the infections. As a result, his first hypothesis was that the Stiletto seeds were the source, and he subsequently undertook to test that hypothesis. The hallmark of scientific knowledge is the scientific method, which requires the development of hypotheses and attempts to disprove them through experimentation. See Daubert, 509 U.S. at 593; Bynum,

3 F.3d at 774. Instead of disproving his hypothesis that the Stiletto seed was the source of the XCV, however, Dr. Gitaitis's experiment confirmed it. He therefore did not undertake to test other hypotheses. He also testified that had he ruled out the Stiletto seeds as the source, he would have considered other theories. His research was therefore not a biased, single-minded quest to prove Stiletto seeds were the culprit behind the BLS outbreak, but rather an informed process of elimination consistent with the scientific method.

(ii) Consideration of Pre- and Post-Marketing Tests

Clifton further asks the Court to consider the results of Syngenta's testing of its own seeds, which produced negative results for the presence of XCV bacteria. This, it argues, is evidence that Dr. Gitaitis's methodology was flawed. It cites McClain for the proposition that "when the opinions clearly demonstrate something about the expert's methodology . . . the court can draw inferences about the methodology from the opinions." McClain, 401 F.3d at 1248 n.8. Clifton take this language out of context, however.

McClain involved a toxic tort claim that turned on the issue of causation. Id. at 1239. The challenged expert provided testimony that *any* dose of the chemical compound at issue in the case was "too much." Id. at 1242-43. A basic concept of toxicology, however, is that individuals can be safely exposed to toxic substances up to a threshold level. Id. at 1242. Therefore, the expert's conclusion itself contradicted basic principles of the methodology in the field of toxicology. Id. at

1243.

The present case is readily distinguishable from the facts in McClain. Nothing about Dr. Gitaitis's conclusions call into question his methodology. The Court has no discretion to exclude expert testimony based on the fact that the results are favorable or unfavorable to one of the parties. As the Daubert Court cautioned, the focus of the reliability inquiry is solely on the methodology, not the outcome. Daubert, 509 U.S. at 595. There are reasonable explanations for the difference in outcomes of the tests, to which Dr. Gitaitis and Dr. Jones testified. Whether Syngenta's tests deserve more weight than Dr. Gitaitis's grow-out is a matter for the jury.

(iii) Replication

Clifton next argues that Dr. Gitaitis's methodology is unreliable because an independent lab could not replicate his findings using the same methodology. The Daubert Court was careful, however, to distinguish evidentiary reliability from the concept of scientific reliability. Scientific reliability refers to the application of a principle or theory producing consistent results; evidentiary reliability is based upon scientific validity, i.e., the principle is trustworthy and "supports what it purports to show." Id. at 590 n.9. Clifton's replication objection is based on the grow-out failing to produce consistent results and is therefore based on a lack of scientific reliability, even though all that Daubert requires is evidentiary reliability. Daubert does not mandate that Dr. Gitaitis's test results be reproduced as a prerequisite to

admissibility. Dr. Gitaitis provided a written protocol that allowed other labs to repeat his experiment; the fact that those labs produced different results is an argument that goes to the weight of the evidence but does not prevent it from being introduced as evidence at trial.

(iv) Written Protocol

Clifton contends that the failure to commit the protocol to writing before executing the test renders the methodology unreliable. The Court of Appeals of the United States for the Eight Circuit addressed this concern in United States v. Boswell. 270 U.S. 1200 (8th Cir. 2001). The court acknowledged that the researcher had followed no written protocol, but that he had provided testimony describing the method and procedures he used. Id. at 1205. It held that the lack of a written protocol did not prove that "there were significant deficiencies in the protocol and procedure" that the challenged expert used. Id. The court therefore concluded that the failure to use a written protocol went to the weight of the evidence and not the admissibility. Id.

In the present case Clifton does not argue that the protocol followed was different from the written protocol that Dr. Gitaitis and Sanders provided. It also does not argue that the general lack of documentation during the experiment had any identifiable effect on the accuracy of the experiment. Instead, it seems to suggest that the lack of a written protocol indicates that Dr. Gitaitis and Sanders were not following any protocol at all, and were instead engaged in sloppy research and

haphazard execution of the experiment. There is certainly no evidence in the record that supports such a theory. In fact, the testimony of Dr. Gitaitis, Sanders, and Dr. Jones, along with Dr. Gitaitis's extensive research experience and professional accomplishments, indicate that the research performed under Dr. Gitaitis's direction is performed in a professional manner. Dr. Gitaitis's testimony is therefore admissible despite his failure to commit the protocol for the grow-out to paper before conducting the test.

### (v) Contamination

As detailed above, steps were taken to prevent contamination, including the physical location of the grow-out, the use of new materials, covered trays, and gloves, and the sterile plating of extracted samples. The only omissions of which Clifton complains were the failure to sterilize the cans of seeds before opening them and the fact that Dr. Gitaitis did not personally observe his assistant's contamination prevention procedures. Rule 702 certainly does not require a lab's head researcher to personally observe contamination prevention procedures. The precautions Sanders took made it "highly improbable" that contamination occurred. Jones Aff. ¶ 6.a.ii. Clifton is free to argue at trial that contamination occurred during the experiment, but the Court finds that this slight possibility does not render the testimony regarding the grow-out inadmissible.

### C. Conclusion

The Court finds that the testimony of Dr. Gitaitis meets all the admissibility

standards of Rule 702, including reliability. As the United States Court of Appeals for the Third Circuit stated, a proponent of expert testimony does "not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . .The evidentiary requirement of reliability is lower than the merits standard of correctness." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994). Any deficiencies in Dr. Gitaitis's expert opinion are properly addressed through "[v]igerous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to the jury, not by excluding his testimony altogether. See Daubert, 509 U.S. at 595. The Motion in Limine is therefore denied.

## V. CONCLUSION

Syngenta's Motion for Summary Judgment (Doc. 140) is granted, according to the Parties' agreement. Clifton's Motion for Summary Judgment (Doc. 146) on the LTF Defendants' claims is denied with respect to the breach of implied warranty claim and rendered moot in part by the LTF Defendants' voluntary withdrawal of the strict liability claim. LTF Defendants' Motion for Summary Judgment (Doc. 156) on DL&B's claims is granted. Accordingly, Florists' Mutual's action for declaratory judgment is moot and is dismissed, and its Motion for Summary Judgment (Doc. 139) on the issue of its policy coverage is therefore denied as moot. LTF

Defendant's claim for indemnity on DL&B's claims is dismissed and Syngenta's Motion for Summary Judgment (Doc. 144) is thus rendered moot. LTF Defendants' Motion for Partial Summary Judgment (Doc. 148) is rendered moot with respect to Syngenta's defenses and granted with respect to Clifton's Second Additional Defense. Finally, the Motion in Limine (Doc. 129) is denied. The remaining Parties are LTF Greenhouses, Lewis Taylor Farms, Quality Produce and Clifton. These Parties are hereby realigned so that LTF Greenhouses, Lewis Taylor Farms, and Quality Produce are Plaintiffs and Clifton is the Defendant.

**SO ORDERED**, this the 27th day of March, 2008.

*s/ Hugh Lawson*
**HUGH LAWSON, Judge**

tch